# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| vs. ) | Case no. 1:90-cr-266-VEH-TMP |
| ) | |
| DAVID RONALD CHANDLER, ) | |
| ) | |
| Defendant/Movant. ) | |

## MEMORANDUM OPINION AND ORDER

The coelacanth, *Latimeria chalumnae*, is a fish that biologists presumed to have become extinct during the late Cretaceous period;[1] it was known only to modern science through the fossil record. But *L. chalumnae*[2] was discovered, extant and apparently unevolved, off the east coast of South Africa in the mid-twentieth century. Creatures like the coelacanth are described as Lazarus taxa (after the biblical Lazarus who was resurrected by Jesus) because they vanish from the fossil record for a very long time—in the case of *Latimeria*, 65 million years—only to reappear relatively unchanged.

---

[1] *See* Coelacanth, NATIONAL GEOGRAPHIC, http://animals.nationalgeographic.com/animals/fish/coelacanth (last visited Apr. 11, 2016).

[2] The coelacanth was given its Linnaean name after its modern discovery, with the species name, *chalumnae*, being a reference to the South African river near which it was discovered. A second species, *L. menadoensis*, was later found off the coast of Indonesia.

Movant David Ronald Chandler's motion for a writ of *audita querela*[3] is not unlike the coelacanth. One is tempted call it a Lazarus motion, since its civil form was abolished in 1946. Yet, comes now Chandler, claiming to have found *A. querela* in the wild—and that it is sufficiently virile to vacate a criminal judgment.[4] But regardless of the label Chandler attaches, the relief he seeks is only available under 28 U.S.C. § 2255. So Chandler's motion is more accurately characterized as an Elvis motion, "Elvis" being the name given to taxa that appear to be one and the same as an extinct species but are, in fact, unrelated.[5] One observes the same relationship between Elvis impersonators and the King.[6] Whatever superficial resemblance Chandler's motion bears to *audita querela*, it is in fact a motion under section 2255.

I

Chandler's motion invokes this court's power under the All Writs Act to, he says, "fashion extraordinary remedies when the need arises." (Doc. 572 at 1). Chandler claims that he does not challenge his sentence or conviction, but he does ask the court

---

[3] Doc. 572.

[4] Despite his disclaimer that he is not challenging the validity of his murder conviction or sentence, Chandler goes on to argue that the prosecutor was never properly appointed to prosecute the case (or even appear in the case) and that his conviction is "tainted" as a result. (Doc. 572, p. 2).

[5] *See* Douglas H. Erwin and Mary L. Droser, *Elvis Taxa*, 8 PALAIOS 623, 623–24 (1993).

[6] *See id.*

to vacate its judgment. The vacatur is necessary, Chandler says, because certain "errors of fact" have influenced the outcome in his case. Specifically, Chandler argues that the Eleventh Circuit, in his direct appeal, erroneously labored under the belief that the prosecutor who had abortively prosecuted the murder in state court, Joe Hubbard, was appointed a Special Assistant United States Attorney (SAUSA) for the federal prosecution. Chandler contends Hubbard never received an appointment, yet Hubbard assisted in Chandler's prosecution.

This error of fact, in Chandler's view, is "fundamental," and it "[t]aint[ed]" his conviction. It is not entirely clear why Chandler believes the error to have been so apocalyptic, but it appears Chandler's position is that Hubbard prosecuted Chandler without the authority to do so as an officer of the United States. Chandler apparently believes that Hubbard, after failing to obtain a conviction in state court, became a vigilante of sorts and unlawfully prosecuted Chandler in federal court.[7] A necessary premise of Chandler's argument in favor of vacatur is that a conviction obtained by a prosecutor who was defectively appointed is void, or at least voidable. Chandler believes that no provision of the United States code provides a means of challenging such a conviction, so *audita querela* survives the codification of the *habeas* statutes to

---

[7] It is not at all clear that this is an accurate representation of what happened. Now-Judge, then-Assistant U.S. Attorney, Davis signed the superseding indictment and appears to have tried the case, so to the extent that Hubbard was a SAUSA, he does not appear to have been the one running the case.

provide relief to those in Chandler's situation.

## II-A

The writ of *audita querela,* Law Latin for "the complaint having been heard," BLACK'S LAW DICTIONARY (10th ed. 2014), is ancient; its use in England dates back to at least 1336. Ira P. Robbins, *The Revitalization of the Common-Law Civil Writ of Audita Querela as a Postconviction Remedy in Criminal Cases: The Immigration Context and Beyond*, 6 GEO. IMMIGR. L.J. 643, 646 (1992) (citing THEODORE F.T. PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW 394 (5th ed. 1956)). Although American courts have long regarded *audita querela* as "shrouded in ancient lore and mystery," FED R. CIV. P. 60 advisory committee's note to the 1946 amendment, its canonical formulation is a writ "afford[ing] relief to a judgment debtor against a judgment or execution because of some defense or discharge arising subsequent to the rendition of the judgment or the issue of the execution." 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2867, at 553 (3d ed. 2012). It appears that the most commonly invoked defense was that the debt was paid. *See* Robbins, 6 GEO. IMMIGR. L.J. at 647.

The need for such a writ in England was precipitated by Parliament's creation of a novel debt obligation that expedited the process of debt collection. In the fourteenth century, Parliament was solicitous of investment in England by continental

merchants, Note, Caleb J. Fountain, *Audita Querela and the Limits of Federal Nonretroactivity*, 70 N.Y.U. ANN. SURV. AM. L. 203, 211 (2014) (citing Statute of Acton Burnell, 1283, 11 Edw. 1, pmbl.), but the merchants were apprehensive about the speed with which they could obtain judgments, and thus collect, against debtors in the common law courts. *Id.* at 212 (citing E.K. HUNT, PROPERTY AND PROPHETS: THE EVOLUTION OF ECONOMIC INSTITUTIONS AND IDEOLOGIES 18-19 (7th ed. 2003)). Attempting to assuage the merchants' concerns, Parliament created a form of obligation that, upon the creditor's and debtor's agreement to the loan terms, became a valid judgment *eo instante*, so it could be immediately executed upon default. *See id.* at 213–17. Upon execution, the debtor's property was seized, and if the debtor still owed anything after being dispossessed, he was thrown in jail. *Id.* at 213 (citing Statute of Acton Burnell, 1283, 11 Edw. 1, *reprinted* in 1 Statutes of the Realm 53, 98 (1810-28)). A later statute omitted the dispossession and just sent debtors straight to jail. *Id.* (citing Statute of Merchants, 1285, 13 Edw. 1).

Enter *audita querela*. The justices of the King's Bench were alarmed that "without answer, one may be ousted from his land by execution on statute merchant." *Id.* at 215 (quoting *Cestre v. Anon.*, Y.B. 18 Edw. 3, Trin., pl. 17 (1344) (Eng.), *reprinted* in 11 YEAR BOOKS OF THE REIGN OF KING EDWARD THE THIRD 308 (Luke Owen Pike ed. & trans., 1904)). Because of the automatic judgment mechanism,

5

debtors were unable to present defenses to the enforcement of debt obligations, such as payment of the debt. *Audita querela* remedied this, giving debtors their "day in court," *Woodbridge v. Winthrop*, 1 Root 557, 575 (Conn. 1794), to defend against execution. Fountain, 70 N.Y.U. ANN. SURV. AM. L. at 216–17.

Across the sea, in the colonies and later the states, *audita querela's* use expanded far beyond curing the disease that spurred its creation, coming to include "relief for matters arising before judgment, thereby blurring the distinction between *audita querela* and *coram nobis* (or *vobis*)." *Gonzalez v. Secretary for Dept. Of Corrections*, 366 F.3d 1253, 1289–90 (11th Cir. 2004) (Tjoflat, J., specially concurring in part and dissenting in part). Over time, courts interpreted the ancient writs, *audita querela* and *coram nobis*, to provide a hodgepodge of substantive grounds for collateral attack. *See* James Wm. Moore and Elizabeth B.A. Rogers, *Federal Relief from Civil Judgements*, 55 YALE L.J. 623, 659–674 (1946) (describing the uses of *audita querela* and *coram nobis*).[8] The expansive treatment of *audita querela* reached its apotheosis in the late nineteenth and early twentieth centuries, when a few state courts concluded that it was cognizable as an avenue of criminal post-conviction relief. *See, e.g.*, *Keith*

---

[8] At least some of the impetus for this use of the ancient writs was the inability of early American courts to modify judgments outside of the term in which the judgment was entered. If the court had moved on to a new term, the only resort was to the ancient writs. *See United States v. Beggerly*, 524 U.S. 38, 42 (1998).

*v. Florida*, 163 So. 884, 885 (Fla. 1935). But it was not to last.

Like its cousins *coram nobis* and *coram vobis*, *audita querela* was abolished in the federal civil practice by the 1946 amendments to Civil Rule 60. The abolition of the ancient writs was the product of the drafter's frustration with the writs' lenticular nature;[9] the only consistency in their application was that they applied at the whimsy of the presiding judge. *See Klapprott v. United States,* 335 U.S. 601, 614 (1949) (Black, J.) ("[F]ew courts ever have agreed as to what circumstances would justify relief under these old remedies.").

The civil elegy was barely completed, however, before the Supreme Court declared that the abolition found in Rule 60—"a rule of civil procedure," *United States v. Fonseca-Martinez*, 36 F.3d 62, 64 (9th Cir. 1994) (emphasis in original)—had no effect on whether the ancient writs may issue in criminal cases. *See United States v. Morgan*, 346 U.S. 502, 505 n. 4 (1954). The authority to issue such writs was granted by the "all-writs section[10] of the Judicial Code . . . [which] originated in the Judiciary Act of 1789." *Id.* at 506. Declaring Rule 60 impotent in criminal cases and the all-writs section still a font of power, the Court pulled *coram nobis* off life support and sent it

---

[9] The image in a lenticular print changes depending on the angle at which it is viewed.

[10] Codified at 28 U.S.C. § 1651. "The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute." *Pennsylvania Bureau of Correction v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985).

back to the front as a post-conviction remedy to supplement the *habeas* statutes.

The question of whether *audita querela* would be similarly "resuscitated" in the criminal context took a surprisingly long time to answer. *See United States v. Holder*, 936 F.2d 1, 4 (1st Cir. 1991) (hypothesizing that the first post-*Morgan* use of *audita querela* to vacate a criminal judgment was in 1988, in *United States v. Salgado*, 692 F. Supp. 1265 (E.D. Wash. 1988)). "Resuscitated" appears in scare quotes because, to be resuscitated, *audita querela* would have to have been cognizable in federal criminal cases in the first place. It was not used in criminal proceedings in England, and it only came to be used as a form of post-conviction remedy after the bar and bench had evidently forgotten why it was created, or, at the least, after its original function was obscured by the mists of time. *Cf. Coffin v. Ewer*, 46 Mass. (5 Met.) 228, 230 (Mass. 1842) ("We find . . . so little learning" on *audita querela's* "appropriate office.").

The courts of appeals have expressed varying levels of skepticism about whether *audita querela* is available at all in criminal proceedings, *compare United States v. Reyes*, 945 F.2d 862, 865 (5th Cir. 1991) (expressing "doubts" about *audita querela's* application in a criminal setting), *with United States v. Ayala*, 894 F.2d 425, 429–30 (noting that some state courts used the writ as a post-conviction remedy, but declining to resolve its federal viability), but where they have explicitly considered the issue, they have uniformly avoided it by finding *audita querela's* issuance—assuming *arguendo*

its criminal application—would be inappropriate in the cases before them.

The Eleventh Circuit has joined the unanimous chorus.[11] The cases begin with the premise that "[t]he teaching of *Morgan* is that federal courts may properly <u>fill the interstices</u> of the federal postconviction remedial framework through remedies available at common law." *United States v. Holt*, 417 F.3d 1172, 1175 (11th Cir. 2005) (quoting *Ayala*, 894 F.2d at 428) (emphasis added). When the relief sought under *audita querela* is cognizable under section 2255 or *coram nobis*, there is no interstice in need of filling; thus, *audita querela* will not lie. No court of appeals, in a published opinion, has ever found such a gap, but since the existence of a space needing filling is a condition precedent to the issuance of *audita querela*, the court must consider whether Chandler's claim, if valid, would not be cognizable under the extant post-conviction remedies.

## II-B

It is well settled that the label *pro se* litigants attach to their motions is not dispositive, *see Castro v. United States*, 540 U.S. 375, 381 (2003) (collecting

---

[11] A panel of the Sixth Circuit attempted to sing off-key and issue the writ, but the full court, apparently alarmed by the disharmony, vacated the opinion. The appeal was dismissed before the full court heard the case. *See Ejelonu v. I.N.S., Dept. Of Homeland Sec.*, 355 F.3d 539 (6th Cir. 2004), *reh'g en banc granted, opinion vacated* (July 28, 2004), *appeal dismissed* (Oct. 18, 2004). The Fourth Circuit does not appear to have issued a published opinion on the topic.

cases), and "courts regularly have recharacterized imaginatively captioned petitions to reflect that they derive their essence from section 2255." *Trenkler v. United States*, 536 F.3d 85, 97 (1st Cir. 2008). That the affixed label corresponds with an arcane writ plucked from the common law's primordial soup does not change the rule; "[i]t is [always] substance that controls." *Melton v. United States*, 359 F.3d 855, 857 (7th Cir. 2004).

## II-C.

To figure out whether Chandler's motion plugs a gap or is an extant remedy (2241, 2255, *coram nobis*) in disguise, the best place to start is the basis for his sought vacatur. *Cf. In re Davenport*, 147 F.3d 605, 608 (7th Cir. 1998) (choosing section 2255 over the "esoteric writs" on the basis of the relief sought and the ground on which it is sought). Here, the basis is Chandler's asseveration that the state prosecutor in his case was never appointed as a SAUSA, *see* 28 U.S.C. § 543; *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 487–88 (2010) (appointment of officers of United States must comply with Appointments Clause, U.S. CONST. art. II, § 2, cl. 2), and, thus, Chandler was prosecuted by a man who lacked authority to act on behalf of the United States. *See* 28 U.S.C. § 547; *Bass Angler Sportsman Soc. v. U.S. Steel Corp.*, 324 F. Supp. 412, 415 (S.D. Ala. 1971), *aff'd. sub nom. Bass Anglers Sportsman Soc. v.*

*Koppers Co.*, 447 F.2d 1304 (5th Cir. 1971) ("criminal statutes can only be enforced by the proper authorities of the United States Government.").[12]

If the defective appointment of a prosecutor is subject to collateral attack at all,[13] it is cognizable under 28 U.S.C. § 2255. The Eleventh Circuit's decision in *Trupei v. United States,* 304 F. App'x 776, 784 (11th Cir. 2008), logically, although not formally, *see* 11th CIR. R. 36-2, compels the conclusion that Chandler's motion is one under section 2255. There, the plaintiff prisoner filed a *Bivens*[14] action against his prosecutors, alleging that, because they were not appointed in conformity with Art. II, § 2, cl. 2, they had "unlawfully caused him to be indicted, tried, convicted, and sentenced." *Id.* The Eleventh Circuit concluded that the suit attacked the validity of the plaintiff's conviction, and was therefore barred by *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), which prohibits damages actions under section 1983 where a plaintiff's judgment would "necessarily imply the invalidity"

---

[12] This authority is controlling in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

[13] In *United States v. Suescun*, 237 F.3d 1284, 1286–87 (11th Cir. 2001), the Eleventh Circuit held that a challenge to the prosecuting attorney's power to bring charges must be raised in accordance with FED. R. CRIM. P. 12(f), and, if not so raised, is waived.

[14] So named for *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), in which the Supreme Court created a damages action that the Court later described as "the federal analog to suits brought under . . . 42 U.S.C. § 1983." *Ashcroft v. Iqbal*, 556 U.S. 662, 675–76 (2009).

of his conviction.

*Heck* rested on the premise, established in *Preiser v. Rodriguez*, 411 U.S. 745 (1973), that "*habeas corpus* is the exclusive remedy for a . . . prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release." *Heck,* 512 U.S. at 481 (citing *Preiser*, 411 U.S. at 488–90) (italics added). The *Heck* court extended the *Preiser* rule to judgments that would "necessarily imply the unlawfulness" of custody. *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005).

So a challenge to the legitimacy of a prosecutorial appointment (while confined) is an attack on the validity of confinement and, thus, cognizable <u>only</u> under the *habeas* statutes. With section 2255 (or, possibly, section 2241) being the only available avenue of relief for Chandler's claim, there is no gap in the federal post-conviction remedial scheme for *audita querela* to fill. The ancient writ slumbers still.[15]

Accordingly, the Clerk is **DIRECTED** to file Doc. 572 (and the accompanying doc. 573 motion for appointment of counsel) as a motion for relief from a criminal conviction or sentence under § 2255, assigning the motion (doc. 572) a new civil 8000 number. Upon the docketing of the motion with a new 8000

---

[15] Because the threshold issue (the existence of a gap) is answered in the negative, the court need not consider the next logical question: whether *audita querela* would be a proper vehicle for Chandler's challenge.

number, Docs. 572 and 573 in the instant case will be **TERMED**.

The Clerk is **DIRECTED** to mail a copy of the foregoing to the movant/petitioner.

**DONE** this 28th day of April, 2016.

 

**VIRGINIA EMERSON HOPKINS**
United States District Judge